**ACTIUM LLP**
Mike Gatto, State Bar No. 232674
99 South Lake Avenue, Suite 501
Pasadena, CA 91001
Telephone: 323-819-0300
Email: mike@actiumllp.com

*Attorneys for Plaintiff*
*Our Clean Oceans Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

OUR CLEAN OCEANS, INC, a
California corporation,

               Plaintiff,

v.

CONTRACTORS WARDROBE.
INC., a California corporation,

               Defendant.

Case No. **2:26-cv-1729**

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND CIVIL
PENALTIES**

(Under Federal Water Pollution
Control Act:  33 U.S.C. §§ 1251 *et
seq.*)

Plaintiff Our Clean Oceans Inc. by and through its counsel hereby alleges:

## I.  JURISDICTION AND VENUE

1.  This is a civil suit brought under the citizen-suit enforcement provision of the Federal Water Pollution Control Act 33 U.S.C. §§ 1251 et seq. ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject-matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and/or laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§

55745715.18/016644.00040

1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.  On August 12, 2025, Our Clean Oceans ("OCO") issued a 60-day Notice of Violation and Intent to File Suite under the Clean Water Act ("Notice Letter") attached hereto as Exhibit A and fully incorporated by reference herein, to Defendant Contractors Wardrobe, Inc., ("Defendant" or "CWI"), for facilities under its control, located at 26121 Avenue Hall and 26150 Technology Drive, in Valencia, with Waste Discharger Identification Number 4 19I030520 (hereinafter, "the Facility"). The Notice Letter informed Defendant of the violations alleged therein of the CWA and California's General Industrial Storm Water Permit[1] ("General Permit") at the Facility. The Notice Letter put Defendant on notice of OCO's intent to file suit against Defendant to enforce the CWA and General Permit.

3.  The Notice Letter was sent to Defendant's Registered Agent and an officer and representatives of Defendant at the Facility, in compliance with 40 C.F.R. § 135.2(a)(2). The Notice Letter was also sent to the Acting United States Attorney General, the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Officer of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region, ("Regional Board"), as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(l)(A). See Exhibit A.

4.  More than sixty days have passed since the Notice Letter was served on the Defendant and the aforementioned agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice

---

[1] National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS00000l, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ) ("1997 Permit"), as superseded by Order No. 2014-0057-DWQ and amended by Order No. 2015-0122-DWQ ("2015 Permit").

55745715.18/016644.00040

Letter and in this complaint. See 33 U.S.C. § 1365(b)(l)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

5.    Venue is proper in the Central District of California pursuant to Section 505(c)(i) of the CWA, 33 U.S.C. § 1365(c)(i), because Defendant and the sources of the violations alleged herein are located within this District.

## II.    INTRODUCTION

6.    This Complaint seeks relief for the Defendant's discharges of pollutants into waters of the United States from its industrial operations at the Facility. Specifically, OCO is informed and believes, and thereon alleges, that Defendant's Facility discharges pollutants to the Santa Clara River, which flows to the Pacific Ocean (collectively referred to as the "Receiving Waters"), in violation of the substantive and procedural requirements of the General Permit and the CWA. OCO alleges these violations have been occurring since at least November 11, 2020.

7.    With every storm, hundreds of millions of gallons of polluted water, originating from industrial operations, such as the Facility, pour into storm drains and local waterways, such as the Receiving Waters. Water-quality specialists state that stormwater pollution accounts for more than half of the total pollution entering marine and river environments each year. The Receiving Waters are ecologically sensitive areas and are essential habitat for dozens of fish and bird species and invertebrates. Stormwater and non-stormwater may contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants.  Polluted stormwater harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters may expose many people to toxic metals and other contaminants in water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, can also be impacted by polluted discharges.

8.     This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert-witness fees for Defendant's violations of the General Permit and the Clean Water Act, resulting from Defendant's operations at the Facility.

9.     Our Clean Oceans specifically alleges violations regarding Defendant's discharge of pollutants from the Facility into the Receiving Waters; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other requirements of the General Permit and the Clean Water Act.

## III.     **PARTIES**

10.     Our Clean Oceans is a non-profit 501(c)(3) public benefit corporation organized under the laws of the State of California. It has an office at 8549 Wilshire Blvd. #2121, in Beverly Hills, California.

11.     Our Clean Oceans has members who live and/or recreate in and around Los Angeles County. Our Clean Oceans is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters, particularly our cherished California coastline. To further these goals, Our Clean Oceans actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

12.     Our Clean Oceans' members live, work, travel near, recreate in, use and enjoy the waters near the Facility, including affected rivers, wetlands, and beaches, for biking, boating, kayaking, bird watching, riding horses, viewing wildlife, hiking, walking, running, swimming, and engaging in scientific study, including monitoring and restoration activities.

13.     Our Clean Oceans engages in activities throughout Southern California that restore physical habitat. Our Clean Oceans also contributes to supplemental environmental projects in and near waterways and open space near the Facility.

14.    OCO alleges that the violations alleged herein negatively impact and harm OCO's members' use and enjoyment of the Receiving Waters, and that the interests of Our Clean Oceans' members have been and will continue to be adversely affected by the violations alleged herein such violations continue, including irreparable harm for which Plaintiff and its members lack an adequate remedy at law.

15.    Plaintiff is informed and believes, and thereon alleges, that Defendant is an active California domestic corporation with its headquarters and principal place of business at 26121 Avenue Hall in Valencia, California, and is the owner and/or operator of the Facility, and whose agent and officer was duly served (OCO occasionally refers to Defendant and its management as the "Owners/Operators" of the Facility).

## IV.    STATUTORY AND REGULATORY BASIS

### A.    The Clean Water Act

16.    Section 30l(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b); *San Francisco Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1156 (9th Cir. 2002).

17.    Section 402(p) of the CWA establishes a framework for regulating municipal and industrial stormwater discharges under the NPDES program. 33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial stormwater discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial stormwater dischargers. 33 U.S.C. § 1342.

18.    Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater, must

55745715.18/016644.00040

achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. See 33 U.S.C. § 131 l(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

19.    The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 131 l(a); see 40 C.F.R. § 122.26(c)(I).

20.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); see 40 C.F.R. § 122.2.

21.    The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); see 40 C.F.R. § 122.2. 31.

22.    The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); see 40 C.F.R. § 122.2.

23.    "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

24.    "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

25.    The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." See 40 C.F.R. § 122.2. The EPA

interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.

26. The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. See *Rapanos v. United States* (2006) 547 U.S. 715; see also *N. Cal. River Watch v. City of Healdsburg* (9th Cir. 2007) 496 F.3d 993.

27. A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

28. A significant nexus is also established if waters that are tributary to navigable waters have flood-control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-01.

29. Section 505(a)(l) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation ... or an order issued by the Administrator or a State with respect to such a standard or limitation." See 33 U.S.C. §§ 1365(a)(i) and 1365(f).

30. The Defendant is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

31. An action for injunctive relief authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

32. Pursuant to sections 309(d) and 505 of the Clean Water Act, each separate violation of the CWA occurring after November 2, 2015, and assessed on or

- 7 -
COMPLAINT

after January 15, 2018, subjects the violator to a daily penalty. See 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation (as amended, January 8, 2025)).

33.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.    California's General Permit (Storm Water Permit)**

34.    Much of the responsibility for administering the NPDES permitting system has been delegated to the states. See 33 U.S.C. § 1342(b); see also Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program). Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted stormwater.

35.    States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial stormwater discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial stormwater dischargers. See id.

36.    Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Water Quality Control Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal.App.4th 1377, 1380-81. In California, the State Board is charged with regulating pollutants to protect California's water resources. See Cal. Water Code§ 13001.

37.    The General Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the General Permit are also violations of the CWA. 1997 Permit, Section C(l); 2015 Permit, Section XXI(A).

- 8 -
COMPLAINT

38.    Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. See 33 U.S.C. § 1313(b)(l)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(l).

39.    The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

40.    On July 1, 2015, the 2015 Permit became effective and was issued as NPDES General Permit No. CAS00000l (the same NPDES permit number as the 1997 Permit). 2015 Permit, Section I(A) (Finding 4). The 2015 Permit superseded the 1997 Permit except for enforcement purposes. *Id*. at Section I(A) (Finding 6). The substantive requirements of the 2015 Permit are the same or more stringent than the requirements of 1997 Permit.

41.    On November 6, 2018, the State Board issued an amended but not yet adopted Order No. 2018-0028-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Load ("TMDL") Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit").

42.    To discharge stormwater lawfully in California, industrial dischargers must secure coverage under the General Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, p. 11-V; 2015 Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the General Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water

55745715.18/016644.00040

Associated with Industrial Activity ("NOI") to the State Board. See 1997 Permit, Provision E(l), Finding 3; 2015 Permit, Section I(A) (Finding 17), Section Il(B).

43.    Section 505(a)(l) of the CWA, 33 U.S.C. § 1365(a)(l), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation ... or an order issued by the Administrator or a State with respect to such a standard or limitation." See 33 U.S.C. §§ 1365(a)(i), 1365(£).

## C.    The General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

44.    The General Permit contains certain absolute prohibitions. It prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit, Discharge Prohibition A(l); 2015 Permit, Discharge Prohibition III(B).

45.    Effluent Limitation (B)(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in stormwater discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

46.    Discharge Prohibition (A)(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance.

47.    Under the CWA and the General Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution. 33 U.S.C. § 13ll(b); 1997 Permit, Effluent Limitation B(3);

55745715.18/016644.00040

2015 Permit, Effluent Limitation V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. See Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

48.    The EPA established Parameter Benchmark Values for the following parameters, among others, are as follows: Total Suspended Solids-100 mg/L; Oil & Grease-15 mg/L; Aluminum- .75 mg/I; Iron-1 mg/I; Lead-.069 mg/1; Copper- .0123 mg/I; Zinc- .11 mg/L; and pH-6-9 s. u. The Basin Plan's Water Quality Standards for the relevant region are even more stringent. The 2015 Permit contains Numeric Action Levels ("NALs") for these same parameters that generally mirror the Benchmark Values.

49.    The 2015 Permit includes NALs. 2015 Permit, Section I(M) (Finding 62). During the public commenting period, the State Board stated that ''NALs are not designed or intended to function as numeric technology-based effluent limitations." State Board 2012 Draft Industrial General Permit Response to Comments, Response #6 to Comment #12; see also 2015 Permit Section I(M) (Finding 63).

50.    Receiving Water Limitation C(l) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit stormwater discharges from adversely impacting human health or the environment.

51.    Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the General Permit's Receiving Water Limitation.

52.    Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) of the 2015 Permit prohibit stormwater discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a

COMPLAINT

1  Statewide Water Quality Control Plan or the applicable Regional Board's Basin
2  Plan."

3       53.     Water Quality Standards ("WQS") are pollutant concentration levels
4  determined by the State Board, the various Regional Boards, and the EPA to be
5  protective of the beneficial uses of the waters that receive polluted discharges.

6       54.     California regulates water quality through the State Board and the nine
7  Regional Boards. Each Regional Board maintains a separate Water Quality Control
8  Plan which contains WQS for water bodies within its geographic area.

9       55.     The Los Angeles Regional Water Quality Control Board has issued the
10 Water Quality Control Plan for the region where the Facility is located ("the Basin
11 Plan") to establish water quality objectives, implementation plans for point and non-
12 point source discharges, prohibitions, and to further statewide plans and policies. The
13 Basin Plan sets forth water quality objectives for dissolved metals such as aluminum,
14 arsenic, and mercury and states that the waters shall not receive sediment, settleable
15 materials, or suspended materials that cause nuisance or adversely affect the waters'
16 beneficial uses.

17      56.     The Basin Plan also sets forth water-quality standards and prohibitions
18 applicable to Defendant's stormwater discharges. The Basin Plan includes a narrative
19 toxicity standard which states that "[t]oxic substances shall not be discharged at levels
20 that will bioaccumulate in aquatic resources to levels which are harmful to human
21 health." Further, "[t]he concentrations of toxic pollutants in the water column,
22 sediments or biota shall not adversely affect beneficial uses. *Id.* Additionally, the
23 Basin Plan's Water Quality Standards also require a lesser pH range of 6.5 - 8.5 pH
24 units than the General Permit for inland surface water such as the Santa Clara River
25 and its watersheds. *Id.*

26      57.     Waters that cannot support the Beneficial Uses of those waters listed in
27 the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of
28 the Clean Water Act.

55745715.18/016644.00040

58.    Pursuant to Clean Water Act Section 303(d)'s list of impaired waterbodies, the Santa Clara River Reach 6 is impaired for chloride, chlorpyrifos, temperature, and toxicity, and the Santa Clara River Reach 5 is impaired for chloride, indicator bacteria, Fe, and trash. Pursuant to the SWRCB's applicable HUC-10 Watershed (Upper Santa Clara River), the Facility's watershed is impaired for chloride, chlorpyrifos, diazinon, coliform bacteria, Cu, and Fe. Additionally, the facility is subject to the Santa Clara River Bacteria TMDL which consists of E. coli.

59.    In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

60.    The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 5 0 mg/L. 2

61.    The CTR includes further numeric criteria set to protect human health and the environment in California. See Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

62.    Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

63.    Receiving Water Limitations C(3) and C(4) of the 1997 Permit require a permittee whose discharges exceed the General Permit's Receiving Water Limitations to submit a written report identifying what additional BMPs will be implemented to achieve water quality standards.

COMPLAINT

**D.    The General Permit's Stormwater Pollution Prevention Plan Requirements**

64.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Section A(l)(a) and E(2); 2015 Permit, Sections 1(1) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-storm water discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G).

65.    The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

66.    The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollutions activities, nearby water bodies, and pollutants control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized 11011-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. 1997 Permit, Section A(l)-(10); 2015 Permit, Section X.

67.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to stormwater, and to reduce or prevent the discharge of polluted stormwater from industrial Facility. 1997 Permit, Section A(2); 2015 Permit, Section X.

68.     The General Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the General Permit. 1997 Permit, Section A(9); 2015 Permit, Section X(A)(9).

69.      The General Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

70.     Section A(9)( d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the General Permit. Storm Water Permit, Section A(9)(d)(i)-(vi). If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the General Permit. Id., Section A(9)( d). The evaluation report shall be submitted as part of the Annual Report specified in Section B(l4) of the General Permit. Id.

55745715.18/016644.00040

71.    The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 1997 Permit, Sections A(l), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(l ). Significant SWPPP revisions must be certified and submitted by the discharger via SMARTS within 30 days. 2015 Permit, Section X(B)(2).  Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. Id. at Section X(B)(3); 2015 Permit, Fact Sheet, Section II (I)(l).

### E.    The General Permit's Monitoring and Reporting Requirements

72.    The 1997 Permit required facility operators to develop and implement a monitoring and reporting plan ("M&RP") when industrial activities begin at a facility. 1997 Permit, Sections B(l)-(2) and E(3). The M&RP must have ensured that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit. Id. at Section B(2). The M&RP must have ensured that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. Id.

73.    The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that stormwater and non-stormwater discharges are in compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit, Sections B(2)(a) and B(2)(b); 2015 Permit, Section XI.

74.    The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in stormwater discharges. Id., 1997 Permit Section B(2)(c) and B(2)(d).

75.    The 2015 Permit requires facility operators to monitor and sample stormwater discharges to ensure that the facility is complying with the terms of the permit. 2015 Permit, Sections I(J) (Findings 55-56) and XI.

76.    Section B(2)(d) of the 1997 Permit and Section XI(A)(4) of the 2015 Permit require that the M&RP shall be revised as necessary to ensure compliance with the General Permit.

77.    Section B(4)(a) of the 1997 Permit and Section XI(A) of the 2015 Permit require dischargers to conduct monthly visual observations of stormwater discharges.

78.    Section B(4)(c) of the 1997 Permit and Section XI(A)(2) of the 2015 Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in stormwater discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting stormwater discharges. See 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3). The General Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit, Section B(4)(c); 2015 Permit, Section X(B)(l).

79.    The General Permit requires dischargers to visually observe and collect samples of stormwater discharges from all locations where stormwater is discharged. 1997 Permit, Sections B(5) and B(7); 2015 Permit Section XI(B)(4).

80.    Section B(5)(a) of the 1997 Permit requires dischargers to collect stormwater samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

81.    Section B(5)(b) of the 1997 Permit requires that sampling conducted pursuant to the General Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without stormwater discharge.

- 17 -
COMPLAINT

82.    Section B(5)(c)(i) of the 1997 Permit requires dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and total organic carbon ("TOC"). A discharger may substitute analysis for O&G instead of TOC.

83.    Section B(5)(c)(ii) of the 1997 Permit requires dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the stormwater discharged from the facility.

84.    Section B(14) of the 1997 Permit requires that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(l 3)(i).

85.    Section B(l5)(f) of the 1997 Permit requires that sampling and analysis be performed according to Section B of the 1997 Permit.

86.    Section XI(B)(l) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

87.    Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze stormwater samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

88.    Section XI(B)(6) of the 2015 Permit requires dischargers to analyze stormwater samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed

- 18 -
COMPLAINT

impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

89.    The SWPPP requires testing at the facility for various pollutants.

90.    Section XVI of the 2015 Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## V.    STATEMENT OF FACTS

### A.    The Facilities General Permit Coverage

91.    The Facility is located at 26121 Avenue Hall and 26150 Technology Drive Valencia, CA 91355.

92.    Plaintiff alleges CWI has operated at the Facility since at least February 10, 2021, when Regional Board identified CWI on SMARTS as a "non-filer" operating without General Permit coverage.

93.    Plaintiff alleges that the Facility initially submitted an NOI and initial SWPPP to SMARTS on November 20, 2023.

94.    Plaintiff alleges that the Facility submitted an updated revised SWPPP on October 15, 2024 ("2024 SWPPP"). Attached as Exhibit B is a true and correct copy of the 2024 SWPPP that is incorporated by reference.

95.    The Facility's NOI states the site comprises 8.13 acres with 1 acre exposed to storm water.

96.    The Facility NOI fails to state the percentage of the Facility that is impervious.

97.    The Facility's NOI lists its Standard Industrial Classification ("SIC") Code as 3442 (Metal Doors, Sash, Frames, Molding and Trim Manufacturing) which requires General Permit coverage.

98.    Plaintiff alleges that the Facility submitted an updated revised SWPPP on October 13, 2025 ("2025 SWPPP"). Attached as Exhibit C is a true and correct copy of the 2025 SWPPP that is incorporated by reference.

99.    Per the most recent 2025 SWPPP, the Facility operates "Monday to Friday from 6:000 A.M. – 4:30 P.M."

100.    SMARTS lists the Facility Waste Discharge Identification (WDID) number as 4 19I030520.

101.    The 2024 SWPPP confirms the site comprises 8.13 acres, and further states that impervious surfaces make up "<5% of industrial activity areas."

102.    The 2025 SWPPP stating the site comprises 8.6 acres with 1.4 acres potentially exposed to stormwater and an 85% impervious area.

103.    SMARTS lists the Facility's coverage under the General Permit as "Active."

104.    Plaintiff is informed and believes, and thereon alleges, that the Facility must obtain General Permit coverage for the entire Facility. See id. § XVII(E)(1).

105.    Plaintiff is informed and believes, and thereon alleges, that the owner(s) and/or operator(s) are required to sample storm water for pH, TSS, O&G, Al, Fe, Zn, and N+N pursuant to its SIC Code.

**B.    Industrial Activities and Pollutant Sources at the Facility**

106.    Plaintiff is informed and believes, and thereon alleges, that the Facility designs and manufactures wardrobe doors.

107.    Plaintiff is informed and believes, and thereon alleges, that the Facility's major manufacturing processes include cutting and fabricating aluminum, steel, and other materials to make wardrobe doors, and fabricates installing glass and mirrors in the doors.

55745715.18/016644.00040

108.   Plaintiff is informed and believes, and thereon alleges, that Ancillary activities include painting; wood cutting for custom pallets; material storage; hazardous, solid and recyclable waste storage; outdoor equipment storage (i.e., cardboard baler), and shipping and receiving.

109.   Plaintiff is informed and believes, and thereon alleges, that Defendant conducts industrial activities both indoors and outdoors and that its indoor industrial activities have exposure to the outdoors.

110.   Plaintiffs are informed and believe, and thereon alleges, that the areas of industrial activity and industrial activities at the Facility are sources of pollutants.

111.   Plaintiffs are informed and believe, and thereon allege, that Defendant has not properly developed and/or implemented the required BMPs to address the pollutant sources and associated pollutants at the Facility.

112.   BMPs are necessary at the Facility to prevent the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water from the Facility during rain events.

113.   Plaintiffs are informed and believe, and thereon allege, that the failure of Defendant and/or any other owners and/or operators of the Facility to develop and/or implement required BMPs results in the exposure of pollutants associated with their industrial activities to precipitation, and results in the Facility's discharge of polluted storm water from the Facility into the Receiving Waters in violation of the General Permit and the Clean Water Act.

114.   Plaintiffs are informed and believe, and thereon allege, that the Facility's discharge of polluted storm water have harmed Plaintiffs' members' use and enjoyment of the Receiving Waters by degrading water quality and posing risks to human health and aquatic life.

COMPLAINT

**C.**    **The Facility's Storm Water Sampling Point and Discharge to the Receiving Waters**

115.    The Facility's 2024 SWPPP states, "There are three drainage areas exposed to industrial activities and two sample points at the site as shown on the site map(s)."

116.    The Facility's most recent 2025 SWPPP, indicates that the Facility has four (4) drainage areas and two sample points, that ultimately discharge to the Santa Clara River.

117.    The Facility's most recent 2025 SWPPP, indicates that the Facility has seven stormwater discharge locations at the Facility.

118.    Plaintiff alleges that storm water discharges from the Facility to a municipal storm drain, which discharges into the Santa Clara River, which then flows to the Pacific Ocean.

119.    Plaintiffs allege that the Santa Ana River and Pacific Ocean are all waters of the United States.

**D.**    **Violations of the General Permit's Requirements for BMPs that Achieve BAT and BCT**

120.    Plaintiffs are informed and believe, and thereon allege, that Defendant and/or any other owners and/or operators of the Facility failed to implement BMPs that achieve BAT/BCT at the Facility.

121.    Plaintiffs allege that storm water discharges from the Facility contain concentrations of pollutants associated with the Facility's industrial activities above EPA Benchmarks incorporated into the General Permit as NALs.

122.    Plaintiffs allege that storm water discharges from the Facility contain concentrations of pollutants with exceedances of annual NALs.

123.    The Facility's self-reported sampling results indicate exceedances for N+N, Al, and Zn.

55745715.18/016644.00040

124.   Discharges of Storm Water from the Facility at Concentrations in Excess of the NALs, TMDL NELs, CTR Values, and/or Basin Plan Values include:

| Date of Sample | Discharge Point | Parameter | Result | NAL Value | NEL Value | Basin Plan/ CTR Value |
|---|---|---|---|---|---|---|
| 01/20/2024* | Vl | N+N | 1.91 mg/L | 0.68 mg/L | - | - |
| 01/20/2024* | V3 | N+N | 0.96 mg/L | 0.68 mg/L | - | - |
| 02/05/2025 | Vl | Al | 2.7 mg/L | 0.75 mg/L | - | - |
| 02/05/2025 | Vl | Fe | 1.49mg/L | 1.0 mg/L | - | - |
| 02/05/2025 | VI | Zn | 0.615 mg/L | 0.26 mg/L | - | 0.12 mg/L |

*The self-monitoring report submitted in SMARTS lists 1/22/2024 as the date of sample collection, but the Facility's laboratory report and Chain of Custody (COC) list 1/20/2024.

125.   The Permit requires facilities to analyze all storm water samples for parameters that serve as indicators of the presence of all industrial pollutants identified in the SWPPP's pollutant source assessment. Permit § XI.B.

126.   Plaintiff alleges that numerous additional exceedances would have occurred at the Facility from at least February 10, 2021, had CWI complied with the CWA and General Permit's requirements to file its NOI immediately upon conducting industrial operations at the Facility as opposed to filing.

127.   Plaintiff alleges that, during this time, the Facility was not implementing a storm water pollution prevention program or adequate BMPs to prevent pollutants in discharges from the Facility.

128.   Plaintiff alleges that the Facility's SWPPP fails to narratively assess the Facility's locations including its roof and depict the flow direction of the building

55745715.18/016644.00040

downspouts and "non-industrial" drainage areas thereby prohibiting an accurate assessment of whether the areas claimed as "non-industrial" are exposed to pollutants from the Facility's industrial activities.

129.   On information and belief, OCO alleges that had the Facility conducted a thorough pollutant source and Facility assessment, the Facility would have identified and monitored for additional pollutants.

130.   Plaintiff alleges that the Facility's ongoing discharges of storm water with pollutants in excess of applicable NALs and EPA Benchmarks demonstrate that the Defendants have failed and continue to fail to develop and/or implement BMPs that comply with the General Permit's BAT/BCT standards.

131.   Plaintiff alleges that each day an operator fails to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the Clean Water Act.

132.   Plaintiff alleges that Defendant has been in violation of the BAT and BCT requirements at the Facility since at least February 10, 2021.

**E.    E.    Defendant's Violations of the General Permit's Storm Water Pollution Plan Requirements**

133.   The Facility's SWPPP is publicly available via the SMARTS database and has been revised at least two times.

134.   Plaintiff is informed and believes, and thereon alleges, that the 2025 SWPPP referenced in Paragraph 106 is the current SWPPP for the Facility. (See Exhibit C.)

135.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to adequately develop, implement, and/or revise the Facility's SWPPP in violation of the General Permit's SWPPP requirements. Plaintiff expressly incorporates by references its Notice Letter (See Exhibits A, B and C.)

136.   Plaintiffs allege that the SWPPP has not been updated in response to the owner(s) and/or operator(s)' numerous reported NAL exceedances from the 2023-

COMPLAINT

2024, 2024-2025 and the current 2025-2026 reporting years. General Permit, § X.B. Plaintiff alleges that such revisions could have been warranted earlier due to NAL exceedances, but that Defendant did not upload storm water sampling results to SMARTS for the 2021-2022 and 2022-2023 reporting years.

137.   Additionally, for the exceedances Defendant reported, Plaintiff alleges Defendant failed to upload required ERA documentation to SMARTS that could have then been used as a basis for SWPPP updates.

138.   Plaintiff alleges that the SWPPP fails to conduct a full assessment of potential pollutant sources, including the degree to which pollutants associated with those materials may be exposed, and the direct and indirect pathways by which pollutants may be exposed, to storm water. Permit § X(G)(2). For example, Plaintiff is informed and believes, and on that basis alleges, that the Facility stores and handles hazardous materials but failed to identify the types, characteristics, and quantities of these materials resulting in a failure in the Facility's SWPPP's to include a complete pollutant source assessment.

139.   OCO is informed and believes and thereon alleges that the Facility's industrial activities generate additional pollutants not described in the SWPPP, including pollutants the Facility's watershed is impaired for, that are not being monitored in the Facility's stormwater discharges.

140.   OCO alleges that additional NAL exceedances would have been reported had the Facility sampled four (4) times per reporting year as required by General Permit Section XI.B(2).

141.   Plaintiff alleges the SWPPP does not specify procedures to identify alternate Pollution Prevention Team members to implement the SWPPP and conduct required monitoring when the regularly assigned team members are temporarily unavailable. *Id.* § X.D.1.c.

142.   Plaintiff alleges the SWPPP fails to describe the effectiveness of existing BMPs and the estimated effectiveness of implementing minimum BMPs to reduce or

prevent pollutants in industrial storm water discharges. *Id.* § X(G)(2).  For example, the Facility entered Level 1 for N+N due to the 2023-2024 reporting year exceedances and Level 1 for Al and Zn due to the 2024-2025 reporting year exceedances.

143.   Plaintiff alleges the SWPPP fails to conduct a proper assessment of Best Management Practices. For example, the Facility's self-reported sample results demonstrated exceedances. *Id.* § (X)(H)(2).

144.   Plaintiffs allege that the SWPPP fails to conduct a full analysis of minimum BMPs. Id. § (X)(A). For example, the Site Map fails to identify: the building's roof downspouts and flow directions; storm water flow and discharge locations associated with "nonindustrial" drainage areas; industrial processes/activities performed in each building that have the potential for exposure of pollutants to storm water (i.e., via venting or track out);  the dust and particulate generating areas; the shipping and receiving areas at the Vl and V3 driveway areas; cleaning area(s); and the equipment and maintenance area(s). . *Id.* § X(E)(3)(c).

145.   Plaintiff alleged that each day the Facility operated with an inadequately developed, implemented, and/or improperly revised SWPPP is a separate and distinct violation of the General Permit and the CWA.

146.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been in daily and continuous violation of the General Permit's SWPPP requirements since at least February 10, 2021.

**F.    Defendant's Violations of the General Permit's Monitoring Requirements**

147.   Plaintiffs are informed and believe, and thereon allege, that Defendant and/or any other owners and/or operators of the Facility have been conducting operations at the Facility with an inadequately developed, implemented, and/or improperly revised Monitoring Implementation Program ("MIP").

COMPLAINT

148.   Precipitation data obtained from the National Oceanic and Atmospheric Administration demonstrates there were numerous QSEs at the Facility during the past several Reporting Years that Defendant failed to monitor.

149.   Plaintiffs are informed and believe, and thereon allege, that Defendant fails to collect and analyze storm water discharge samples from all QSEs at the Facility as required by General Permit § XI(B)(3). Examples include:

- Failure to collect, properly sample and analyze the requisite amount of storm water samples during the 86 QSEs that 158occurred.

- Failure to collect the required number of QSEs for the two reporting years since filing its Notice of Intent to comply with the General Permit.

- Erroneously certifying in its Annual Report that the Facility sampled the required number of QSEs during the 2023-2024 reporting year for all discharge locations although the Facility failed to sample the required number of four (4) QSEs for this reporting period.

150.   Plaintiff is informed and believes, and thereon alleges, that the Defendant has failed to analyze storm water samples for all required parameters since at least February 10, 2021.

151.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to conduct and/or document storm water sampling event visual observations from the Facility's discharge location, in violation of General Permit § XI(A), since at least February 10, 2021.

152.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been and continues to be in violation of the General Permit's MIP requirements since at least February 10, 2021.

55745715.18/016644.00040

1
2

### G.     Defendant's Violations of the General Permit's Reporting Requirements

3
4
5

153.   Plaintiff alleges that for the past five years, Defendant has failed to submit Annual Reports that comply with General Permit § XVI's reporting requirements.

6
7
8
9
10
11

154.   Plaintiff alleges that on information and belief, that every Annual Report submitted during the five-year period applicable to this notice erroneously certifies that the Facility included the applicable HUC-10 pollutants in the SWPPP pollutant source assessment and assessed the need for analytical monitoring for the pollutants even though the Facility's SWPPP fails to include the pollutants and/or an assessment during those reporting periods.

12
13
14
15
16
17
18

155.   Plaintiff alleges that on information and belief that the Facility's 2023-2024 Annual Report erroneously certifies that the Facility sampled the required number of QSEs during the reporting year for all discharge locations although the Facility failed to sample the required number of four (4) QSEs for this reporting period. On information and belief, Plaintiff alleges that multiple QSEs occurred during that reporting year that the Facility could have sampled to fulfill Permit requirements.

19
20
21

156.   Plaintiff alleges on information and belief that the Facility's 2024-2025 Annual Report states that there was no Annual Evaluation done during the 2024-2025 reporting year.

22
23
24

157.   Plaintiff alleges that on information and belief Defendant failed to submit all sampling and analytical results via SMARTS within 30 days of obtaining all results for each sampling event from the laboratory.

25
26
27

158.   Plaintiff is informed and believes, and thereon alleges, that Defendant and/or any other owners and/or operators of the Facility have been in violation of the General Permit's reporting requirements since at least February 10, 2021.

28

- 28 -
COMPLAINT

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Stormwater in Violation of the General Permit's Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 131l(a), 1342, 1365(a) and 1365(f)**

159.   Plaintiff incorporates the allegations contained m the above paragraphs as though fully set forth herein.

160.   Plaintiff is informed and believes, and thereon alleges, that Defendant fails to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

161.   Plaintiff is informed and believes, and thereon alleges, that discharges of stormwater containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time stormwater discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Permit and the CWA. See 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 131 l(b).

162.   Defendant violates the General Permit's Effluent Limitations each time stormwater containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

163.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing violations alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Our Clean Oceans has no plain, speedy, or adequate remedy at law.

164.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the

- 29 -
COMPLAINT

Parties. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Stormwater in Violation of the General Permit's Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(t)**

165.   Plaintiff incorporates the allegations contained m the above paragraphs as though fully set forth herein.

166.   Plaintiff is informed and believes, and thereon alleges, that discharges of stormwater containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time stormwater discharges from the Facility.

167.   Plaintiff is informed and believes, and thereon alleges, that stormwater containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Facility each time stormwater discharges from the Facility.

168.   Plaintiff is informed and believes, and thereon alleges, that Defendant violates the General Permit's Receiving Water Limitations each time stormwater containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

169.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Plaintiff is informed and believes, and thereon alleges, that the foregoing violations would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

170.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the

55745715.18/016644.00040

Parties.  WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION

### Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollutant Prevention Plan in Violation of the General Permit and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

171.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

172.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed to develop an adequate SWPPP for the Facility, in violation of the General Permit.

173.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed to adequately implement a SWPPP for the Facility, in violation of the General Permit.

174.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed to adequately revise a SWPPP for the Facility, in violation of the General Permit.

175.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring.

176.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been in violation of the General Permit at the Facility every day from approximately February 10, 2021 to the present.

177.   Plaintiff is informed and believes, and thereon alleges, that Defendant is in violation of the General Permit and the CWA each day Defendant fails to adequately develop, implement, and/or revise the SWPPP for the Facility.

178.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and

- 31 -
COMPLAINT

omissions alleged above would irreparably harm Our Clean Oceans, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

179.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.  WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Plan in Violation of the General and the Clean Water Act. U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(t)**

180.   Plaintiff incorporates the allegations contained m the above paragraphs as though fully set forth herein.

181.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed to develop an adequate M&RP for the Facility, in violation of the General Permit.

182.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed to adequately implement an M&RP for the Facility, in violation of the General Permit.

183.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed to adequately revise an M&RP for the Facility, in violation of the General Permit.

184.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been in violation of the General Permit's monitoring requirements at the Facility every day from February 10, 2021, to the present.

185.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Our Clean Oceans, its members, and

55745715.18/016644.00040

the citizens of California, for which harm they have no plain, speedy, or adequate remedy at law.

186.    An action for declaratory relief is authorized by 28 U.S.C. § 220l(a) because an actual controversy exists as to the rights and other legal relations of the Parties.  WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION

### Defendant's Failure to Comply with the General Permit's Requirement for Annual Reports 33 U.S.C. §§ 131l(a), 1342, 1365(a) and 1365(f)

187.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

188.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to submit Annual Reports that comply with the General Permit § XVI requirements.

189.    Each day since at least November 11, 2020, that Defendant fails to prepare and submit adequate Annual Reports for the Facility is a separate and distinct violation of the General Permit and CWA § 301(a), 33 U.S.C. § 1311(a).

## SIXTH CAUSE OF RELIEF

### Defendant's Failure to Report as Required by the General Permit in Violation of the General Permit and the Clean Water Act. 33 U.S.C. §§ 131l(a), 1342, 1365(a) and 1365(f)

190.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

191.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to sample and analyze stormwater in any reporting year under a claim that there were insufficient qualifying storm events during operating hours.

55745715.18/016644.00040

192.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections XI and XVI of the 2015 Permit.

193.   Plaintiff is informed and believes, and thereon alleges, that Defendant fails to submit ERA Reports to the Regional Board that implement BMPs and control measures sufficient to adequately mitigate the exceedances and violations occurring at the Facility in violation of Section XII(C-D) of the 2015 Permit. Therefore, Plaintiff is informed and believes, and thereon alleges, that there is a high likelihood that the Facility's stormwater discharges will continue to discharge pollutants at levels harmful to water quality.

194.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continue to fail to meet the monitoring and reporting requirements of the General Permit, in violation of Section B(14) of the 1997 Permit and Sections XI and XVI of the 2015 Permit.

195.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed to submit complete Annual Reports to the Regional Board, in violation of Sections XI and XVI of the 2015 Permit.

196.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been in violation of the reporting requirements of the General Permit each day it has operated the Facility without reporting as required by Receiving Water Limitations C(3) and C(4) of the 1997 Permit, and Sections XI, XII(C) and XVI of the 2015 Permit.

197.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been in violation of Sections XI, XII(C) and XVI of the 2015 Permit since at least February 10, 2021.

198.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Our Clean Oceans, its members, and

55745715.18/016644.00040

the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

199.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.  WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.    RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

A.    Declare Defendants to have violated and to be in violation of the CWA as alleged herein;

B.    Enjoin Defendants from discharging polluted storm water from the Facility unless authorized by the General Permit;

C.    Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

D.    Order Defendants to immediately implement storm water pollution control and treatment technologies and measures;

E.    Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

F.    Order Defendants to comply with the General Permit's MIP requirements;

G.    Order Defendants to prepare a SWPPP for the Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the Facility's SWPPP;

H.    Order Defendants to provide Plaintiffs with reports documenting the

- 35 -
COMPLAINT

quality and quantity of the Facility's discharges to waters of the United States and its efforts to comply with the CWA and the Court's orders;

I.      Order Defendants to prepare and submit adequate Annual Reports;

J.      Order Defendants to pay civil penalties, pursuant to CWA §§ 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §19.4 (as amended, January 8, 2025);

K.      Order Defendants to take appropriate actions to restore the quality of waters impaired or adversely affected by its activities;

L.      Award Plaintiffs' costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the CWA, 33 U.S.C. § 1365(d); and,

M.      Award any such other and further relief as this Court may deem appropriate

DATED: 2/18/26          BY: _____

MICHAEL GATTO
Actium LLP

Attorneys for Plaintiff OUR CLEAN OCEANS, INC.

55745715.18/016644.00040



**Exhibit A**

August 12, 2025

**VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

| | |
|---|---|
| Josie Horst<br>Safety Manager<br>Contractors Wardrobe, Inc.<br>26121 Avenue Hall<br>Valencia, CA 91355 | Jarod Butts<br>Registered Agent for Contractors Wardrobe, Inc.<br>Contractors Wardrobe, Inc.<br>26121 Avenue Hall<br>Valencia, CA 91355 |
| Randy DaSalla<br>Vice President of Operations<br>Contractors Wardrobe, Inc.<br>26121 Avenue Hall<br>Valencia, CA 91355 | Greg Butts<br>Chief Executive Officer<br>Contractors Wardrobe, Inc.<br>26121 Avenue Hall<br>Valencia, CA 91355 |

**Re:    Notice of Violations and Intent to File Suit under the Clean Water Act**

To Whom It May Concern:

This letter is sent on behalf of Our Clean Oceans ("OCO") regarding violations of the Clean Water Act ("CWA") and California's General Industrial Storm Water Permit ("General Permit") occurring at Contractors Wardrobe, Inc. ("CWI") located at 26121 Avenue Hall, Valencia, CA 91355 (the "Facility"). The purpose of this letter is to put CWI, Josie Horst, Randy DaSalla, Jarod Butts, and Greg G Butts, collectively the "Owners and/or Operators" of the Facility, on notice of the violations occurring at the Facility and that OCO intends to file suit against CWI for these violations pursuant to the CWA and General Permit. As explained herein, CWI and its Owners and/or Operators are liable for violations of the General Permit that include, but are not limited to, non-compliant discharges of polluted storm water associated with industrial activities into local surface waters.

OCO is a nonprofit 501(c)(3) public benefit corporation organized under the laws of California with an office located in Beverly Hills, CA. OCO's members live, work, and recreate within the Los Angeles County areas. OCO is dedicated to the preservation, protection, and defense of the inland and coastal waters of Los Angeles County, including the Santa Clara River (the "Receiving Water"), its tributaries, and the Pacific Ocean. To further this mission, OCO actively seeks federal and state implementation of the CWA. Where necessary, OCO directly initiates enforcement actions on behalf of itself and its members.

Members of OCO work, live, and recreate in Los Angeles County where they use and/or enjoy the Receiving Water, its tributaries, and the Pacific Ocean, as well as the bordering pathways, parks, fields, and beaches. OCO members also use and enjoy these waterways to bike, kayak, birdwatch, view wildlife, hike, walk, run, fish, surf, swim, and otherwise recreate. As explained in this notice letter, the ongoing and continuous unlawful discharge of pollutants

**CORPORATE HEADQUARTERS**

2618 SAN MIGUEL, SUITE 1885
NEWPORT BEACH CA 92660

833.241.8799
OURCLEANOCEANS.ORG

**REGIONAL OFFICES**

8549 WILSHIRE BLVD #2121
BEVERLY HILLS, CA 90211

945 TARAVAL ST #1033
SAN FRANCISCO, CA 94116

4020 CHICAGO AVE #1050
RIVERSIDE, CA 92507

248 3RD ST #1395
OAKLAND, CA 94607

22999 KENDALL PMB 1012 # 204
SAN BERNARDINO, CA 92407

4231 BALBOA AVENUE #1071
SAN DIEGO, CA 92117

1

Notice of Violations and Intent to File Suit
CWI

from the Facility into this watershed impairs OCO members' use and enjoyment of these waters and requires OCO to expend its limited resources to combat pollution from the facility. Consequently, the interests of OCO and its members have been, are being, and will continue to be adversely affected by CWI's failure to comply with the CWA and the General Permit.

CWI is in ongoing and continuous violation of the substantive and procedural requirements of the CWA, 33 U.S.C. § 1251 et seq. and California's General Permit, pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, Water Quality Order No. 2014-0057-DWQ as amended by Order No. 2015-0122-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; (2) Total Maximum Daily Load ("TMDL") Implementation Requirements; and (3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, and as subsequently amended by Order No. 2018-0028-DWQ incorporating TMDL effluent limits (effective July 1, 2020)(collectively "General Permit").[1]

Pursuant to CWA Section 309(d) (33 U.S.C. § 1319(d)) and the Adjustment for Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the CWA subjects CWI to a penalty of up to $66,712 per day per violation, for all violations occurring during the period commencing five (5) years prior to the date of this Notice of Violations and Intent to File Suit. In addition to civil penalties, OCO intends to seek injunctive relief preventing further violations of the CWA pursuant to Sections 505(a) and (d) (33 U.S.C. §§ 1365(a) and (d)) and such other relief as permitted by law. Further, Section 505(d) of the CWA (33 U.S.C. § 1365(d)) permits OCO to recover costs and fees, including attorneys' fees.

Section 505(b) of the CWA (33 U.S.C. § 1365(b)) requires that sixty (60) days prior to the initiation of a civil action under CWA Section 505(a) (33 U.S.C. § 1365(a)), a citizen-enforcer must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the Chief Administrative Officer of the of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. § 135.2. As required by the CWA, this letter provides statutory notice of the violations that have occurred and continue to occur at the Facility. (40 C.F.R. § 135.3(a)). At the expiration of sixty (60) days from the date of this letter, OCO intends to file suit under CWA Section 505(a) in federal court against CWI for violations of the CWA and the General Permit.

## I.  BACKGROUND

### A.  The Clean Water Act

Congress enacted the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." (33 U.S.C. § 1251). The CWA prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco Baykeeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002). The CWA is administered largely through the NPDES permit program. (33 U.S.C. § 1342). In 1987, the CWA was amended to establish a framework for regulating storm water discharges through the NPDES system. Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987)

---

[1] CWI most recently submitted a Notice of Intent (NOI) to comply with the General Permit for the Facility on or about November 20, 2023.

 OURCLEANOCEANS.ORG                                                    2

Notice of Violations and Intent to File Suit
CWI

(codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants without an NPDES permit, or in violation of a NPDES permit, is illegal. *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states. *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program). The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers, as well as through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. (33 U.S.C. § 1342(b)). Pursuant to Section 402 of the CWA, the Administrator of the EPA has authorized California's State Water Resource Control Board ("SWRCB") to issue individual and general NPDES permits in California. (33 U.S.C. § 1342). The SWRCB coordinates with the Los Angeles Regional Water Quality Control Board ("Regional Board"), which has shared jurisdiction over the Facility for state and federal water pollution control efforts.

## B. California's General Permit for Storm Water Discharges Associated with Industrial Activities

Facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent ("NOI") with Regional Board. (General Permit Sections XXI.A and I.A.12). Facilities must file their NOIs before the initiation of industrial operations. *Id.*

Facilities must strictly comply with all terms and conditions of the General Permit. A violation of the General Permit is a violation of the CWA. (General Permit Section XXI.A). The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting requirements.

Under the current General Permit, facilities must submit various Exceedance Response Action Plans ("ERAs") to the SWRCB outlining effective Best Management Practices ("BMPs") to reduce pollutants if a facility discharges a pollutant above its Numeric Action Level ("NAL"). An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year[2] exceeds the annual NAL value for that parameter. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for Total Suspended Solids ("TSS") or Oil & Grease ("O&G") within a reporting year exceed the instantaneous maximum NAL value or pH is outside of the instantaneous maximum NAL range for two (2) or more analytical results. (General Permit Section XII.A).

---

[2] Under the General Permit, a reporting year is defined as July 1 to June 30.



Notice of Violations and Intent to File Suit
CWI

ERAs consist of two (2) levels, Level 1 and Level 2. If a facility enters Level 1 for an exceedance of a parameter in a reporting year, that facility is required to submit a Level 1 ERA Report to the SWRCB via SMARTS, that sufficiently mitigates the polluted discharges and is prepared by a Qualified Industrial Storm Water Practitioner ("QISP"). If an exceedance of a Level 1 parameter occurs again in a subsequent reporting year before a facility returns to Baseline Status for that parameter, the facility is also required to submit a Level 2 ERA Action Plan to the SWRCB via SMARTS, that sufficiently mitigates the polluted discharges and is prepared by a QISP. A facility that enters Level 2 is also required to submit a QISP prepared Level 2 ERA Technical Report via SMARTS that assesses the effectiveness of the Level 2 ERA Action Plan BMPs in eliminating the relevant exceedances and polluted discharges.

The current General Permit also contains requirements that are specific to Total Maximum Daily Loads ("TMDLs") for watersheds and water bodies with U.S. EPA-approved and U.S. EPA-established TMDLs for facilities covered by the General Permit. TMDLs establish the maximum amount of a pollutant that a water body can receive and still achieve water quality standards. Facilities located within a watershed subject to a TMDL(s) shall comply with any applicable TMDL specific permit requirements as set forth within Attachment E of the General Permit. These requirements include submitting Water Quality Based Corrective Action ("WQBCA") Plans to the SWRCB via SMARTS which require dischargers to identify, develop, and implement BMPs sufficient to eliminate any TMDL exceedances.

## C. CWI's Permitted Industrial Facility

The Facility is located at 26121 Avenue Hall, Valencia, CA 91355, and conducts industrial activities that are subject to the General Permit. The Facility's NOI lists its Standard Industrial Classification ("SIC") Code as 3442 (Metal Doors, Sash, Frames, Molding, and Trim Manufacturing) which requires General Permit coverage. The Facility most recently submitted its NOI to comply with the General Permit for the Facility on or about November 20, 2023. According to Facility's website, CWI was founded in 1972 and has conducted operations at the Facility since at least February 10, 2021, when Regional Board identified CWI on SMARTS as a "non-filer" operating without General Permit coverage.

The Facility's Waste Discharge Identification ("WDID") number is 4 19I030520, and the Facility's NOI states the site comprises 8.13 acres, with 1 acre exposed to storm water but fails to state the percentage of the site that is impervious. The Facility's most recent SWPPP in SMARTS, dated October 2024, confirms the site comprises 8.13 acres, and further states that impervious surfaces make up "<5% of industrial activity areas." CWI designs and manufactures wardrobe doors. The Facility's major manufacturing processes generally consist of cutting and fabricating aluminum and steel to make doors and installing glass and mirrors in the doors.

According to the Facility's SWPPP, industrial activities conducted at the Facility include, but are not limited to: metal cutting and fabrication processes, glass and mirror installation, material storage and handling (including aluminum, steel, glass, mirrors, swarf buster, glues, paints, oils, cleaners, cardboard, and wood), wastewater generation and treatment operations, waste handling and disposal (including sludge, aluminum shavings, glass waste, wastewater residues, oily water, used oil, waste alcohol and rags, paint rags and filters, scrap metal, scrap wood, and scrap cardboard), shipping and receiving, equipment maintenance, and vehicle/forklift traffic.

 OURCLEANOCEANS.ORG

4

Notice of Violations and Intent to File Suit
CWI

Information available to OCO indicates that CWI conducts industrial activities both indoors and outdoors and that its indoor industrial activities have exposure to the outdoors. Industrial materials are handled and stored at various locations throughout the facility, either outdoors without adequate cover to prevent storm water exposure and/or without adequate BMPs to prevent tracking to the outdoors, and without adequate treatment measures to prevent polluted stormwater and non-storm water from discharging the facility. Many pollutants associated with industrial activities occurring indoors or under partial cover regularly escape to the outdoors via wind dispersion, venting, track out, or otherwise, resulting in pollutant dispersal throughout the Facility and off the Facility through ingress and egress and rain events.

Industrial activities taking place indoors, such as metal and glass fabrication operations, can produce shavings, particulates, and dust that can be tracked outdoors by foot and forklift traffic, or by roof vents and/or exhausts through the Facility buildings' ventilation systems. In fact, the buildings at the Facility are equipped with roof fixtures, vents, and exhausts that disperse potential pollutants from indoor industrial activities to the outdoors. Surface areas on the buildings and roof structures have visible staining that indicates the accumulation of pollutants. Section 6.1 (Minimum BMPs and Descriptions) of the Facility's SWPPP lists the annual deep cleaning of the roof as a BMP which further demonstrates that the roof is a source of potential pollutants from indoor dust and particulate generation. Consequently, OCO alleges the Facility has more exposure to storm water than identified and assessed in its SWPPP because of these industrial related particulates accumulating on its roof surfaces or tracking to otherwise "non-industrial" areas contributing to the ongoing and continuing exceedances at the Facility. Notably, the Facility's SWPPP describes the characteristics of many of the materials associated with the Facility's industrial activities as particulates which are susceptible to dispersion and track out. Additionally, the liquids used in and/or generated from equipment such as balers and air compressors, and processes such as wastewater treatment, glass cooling, cleaning, and equipment maintenance are prone to leaks and spills that can be tracked outdoors via foot and forklift traffic.

According to the Facility's SWPPP, numerous industrial activities and materials occur outdoors. Outdoor industrial activities identified in the SWPPP include hazardous waste storage (including waste paint filters and rags, waste hydraulic oil, waste oily water, and waste flammable liquids), swarf buster bin drying, aluminum storage, glass and mirror storage, wood storage, carboard storage, solid waste storage, equipment storage, shipping and receiving, and vehicle/equipment operation. The Facility's SWPPP identifies particulates, tire crumb, dust, oil, residues, iron, and suspended solids as potential pollutant sources associated with outdoor industrial activities but does not adequately describe all potential pollutants associated with these activities and materials as discussed further below. These outdoor activities and potential pollutant sources occur in areas directly exposed to storm water without adequate cover, BMPs, and/or treatment measures.

According to the Facility's SWPPP and available self-monitoring reports, CWI's industrial activities generate potential pollutants including, but not limited to: pH, Oil & Grease (O&G), Total Suspended Solids (TSS), Aluminum (Al), Iron (Fe), Zinc (Zn), and Nitrite plus Nitrate (N+N). However, the SWPPP fails to adequately identify which potential pollutants contribute to these parameters. For example, Appendix 4 (BMP Summary Table) of the SWPPP lists "Metallic and other particulates from tires, possible oil drips from vehicles" as potential pollutant



Notice of Violations and Intent to File Suit
CWI

sources from fork truck and vehicle traffic, and "TSS from windblown regional dust and iron from metal items being stored" as potential pollutant sources from the staging of glass, wood, and metal materials in the yard. But the SWPPP fails to evaluate which parameters are affected by these potential pollutant sources (e.g., tire particulates are a known source of Zn, Aluminum materials are a source of Al, wood is a source of COD, scrap metal is a source of Al, Fe, N+N). Further, the SWPPP's pollutant source assessment does not adequately describe the characteristics of these activities and materials to determine if additional pollutants are present or associated with these materials and activities. For example, the SWPPP does not discuss what type(s) of glass is used at the Facility and whether glass is colored and potentially contains Copper (Cu) which is an impaired pollutant listed for the Facility's watershed as discussed below. As another example, Appendix 3 (Significant Materials List) of the SWPPP shows that waste paint filters and rags are stored and handled at the Facility but does not include a description of the activity that generates this waste or an assessment of the paint's properties to assess whether metals such as lead, cadmium, chromium, mercury, iron oxide, aluminum oxide, and titanium dioxide are present in these materials. Similarly, the SWPPP's pollutant source assessment discusses swarf buster, flocculant, and sludge associated with the Facility's manufacturing processes but does not adequately describe the potential pollutants or associated parameters for these materials. Consequently, OCO alleges that the Facility's industrial activities generate additional potential pollutants that are not discussed in the Facility's SWPPP.

The Facility is required to analyze for pH, TSS, O&G, Al, Fe, Zn, and N+N pursuant to its SIC Code. Facilities must also sample and analyze additional parameters identified on a facility specific basis based on pollutant source assessments, receiving water impairments, or as otherwise required by the Regional Board. (General Permit Section XI.B.6). According to the Facility's SWPPP, discharges from the Facility are received by the Santa Clara River Reach 6. However, it appears that Facility discharge may be received by the Santa Clara River Reach 5 which is in closer proximity south/southwest of the Facility. Confusingly, the Facility's NOI lists the Santa Clarita River as the Facility's receiving water. Pursuant to Clean Water Act Section 303(d)'s list of impaired waterbodies, the Santa Clara River Reach 6 is impaired for chloride, chlorpyrifos, temperature, and toxicity, and the Santa Clara River Reach 5 is impaired for chloride, indicator bacteria, Fe, and trash. Pursuant to the SWRCB's applicable HUC-10 Watershed (Upper Santa Clara River), the Facility's watershed is impaired for chloride, chlorpyrifos, diazinon, coliform bacteria, Cu, and Fe. Additionally, the facility is subject to the Santa Clara River Bacteria TMDL which consists of E. coli.

The Facility's self-reported sampling results indicate exceedances for N+N, Al, and Zn. As discussed above, the Facility's SWPPP does not adequately describe and assess potential pollutants associated with many of its activities and materials which prohibits an accurate assessment of whether additional monitoring parameters for the Receiving Water and watershed such as Cu or toxicity are being or would have been exceeded had the Facility sampled these parameters. In fact, these impaired pollutants are not even listed in the SWPPP. Storm water from the Facility discharges via the local storm sewer system indirectly into the aforementioned Receiving Water. Consequently, these illegal discharges of polluted storm water impact OCO's members use and enjoyment of the Facility's Receiving Water and watershed by contributing to the degradation of these already impaired surface waters, and by posing risks to human well-being, aquatic life, and ecosystem health.



Notice of Violations and Intent to File Suit
CWI

## II.    CWI's VIOLATIONS OF THE CWA AND THE GENERAL PERMIT

Any person or facility discharging storm water associated with industrial activity must comply with the General Permit. (See 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1); General Permit Fact Sheet at VII).  Moreover, pursuant to Section I.A.8 of the General Permit, a facility operator must "comply with all requirements, provisions, limitations, and prohibitions in this General Permit."  Failure to comply with the General Permit is a Clean Water Act violation. (General Permit Section XXI.A).  As an enrollee, CWI has a duty to comply with the General Permit and is subject to all of the provisions therein.

Based on OCO's review of available public documents, primarily from SMARTS, OCO is informed and believes that CWI is in ongoing and continuous violation of both the substantive and procedural requirements of the CWA and the General Permit at the Facility.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the CWA, CWI and its Owners and/or Operators are subject to penalties for these violations of the CWA since at least February 10, 2021.

### A.    Discharges of Polluted Storm Water from the Facility in Violation of the General Permit's Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations

CWI's storm water sampling results provide conclusive evidence of its failure to comply with the General Permit's discharge prohibitions, receiving water limitations and effluent limitations.  Self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).  Further, OCO alleges that numerous additional exceedances would have occurred at the Facility from at least February 10, 2021, had CWI complied with the CWA and General Permit's requirements to file its NOI immediately upon conducting industrial operations at the Facility.  As discussed, CWI has conducted operations at the Facility since at least February 10, 2021, but failed to file its NOI as required by the General Permit until on or about November 20, 2023.  OCO alleges that, during this time, the Facility was not implementing a storm water pollution prevention program or adequate BMPs to prevent pollutants in discharges from the Facility.

#### 1.    Applicable Water Quality Standards

The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance. (General Permit Section III.C.)  The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Board Basin Plan or other statewide water quality requirements.  (General Permit Section III.D).  Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment and shall not cause or contribute to a violation of any water quality-based effluent limitation.  (General Permit Sections VI.A, VI.B).  Upon determination that storm water discharges from a discharger are causing or contributing to an exceedance of water quality standards, a discharger is required to conduct a facility evaluation, identify pollutant sources, and prepare and submit documentation to the Regional Board stating which BMPs and SWPPP



implementation measures are necessary to reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. (General Permit XX.B).

The California Toxics Rule ("CTR") is an applicable water quality standard under the Permit, the violation of which is a violation of Permit conditions. *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.*, 2015 U.S. Dist. LEXIS 108314, *21 (E.D. Cal. 2015). The CTR establishes numeric receiving water limits for toxic pollutants in California surface waters. (40 C.F.R. § 131.38). As such, the CTR has established a numeric limit for the following pollutants alleged to be discharged by the Facility: Zinc (0.12 mg/L). Further, the CTR has also established limits for cadmium, chromium, copper, and lead, which may be present at the Facility as explained above.

The Water Quality Control Plan for the Los Angeles Region ("Basin Plan") also sets forth water quality standards and prohibitions applicable to CWI's storm water discharges. The Basin Plan includes a narrative toxicity standard which states "([a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." In addition to the Zn identified in the Facility's discharges, OCO believes there are other toxic substances present at the Facility that remain unidentified because of the Facility SWPPP's failure to include a complete pollutant source assessment as explained above. The Basin Plan's Water Quality Standards also require a lesser pH range of 6.5 – 8.5 pH units than the General Permit for inland surface waters such as the Santa Clara River and its watershed. (Los Angeles Region Basin Plan).

### 2. Applicable Effluent Limitations

The Effluent Limitations of the Industrial General Permit prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of best available technology economically achievable ("BAT") for toxic pollutants[3] and best conventional pollutant control technology ("BCT") for conventional pollutants. (General Permit Section I.D). Specifically, the Permit "requires control of pollutant discharges using BAT and BCT to reduce and prevent discharges of pollutants, and any more stringent effluent limitations necessary for receiving waters to meet applicable water quality standards." *Id*. Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand, and fecal coliform. (40 C.F.R. § 401.16). All other pollutants are either toxic or nonconventional. *Id*.; 40 C.F.R. § 401.15.

The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. *Santa Monica Baykeeper v. Kramer Metals*, 619 F.Supp.2d 914, 920, 923 (C.D. Cal. 2009); General Permit Section XII.A. These benchmark levels are reflected as NAL values in the General Permit. (See below for applicable NAL Values). A discharger that exceeds an NAL must comply with the ERA requirements in Section XII of the General Permit.

The General Permit also requires a permittee whose discharges violate the General Permit's Receiving Water Limitations or water quality standards, such as TMDL NELs and CTR limits to

---

[3] BAT is defined at 40 CF.R. § 437.1 et seq. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others.



Notice of Violations and Intent to File Suit
CWI

implement additional BMPs to attain compliance with the receiving water limitation or standard. A Discharger that is notified by a Regional Board or who determines its discharge is causing or contributing to an exceedance of a water quality standard must comply with the water quality based corrective actions in Section XX.B of the General Permit.

### 3. The Facility's Storm Water Sample Results

Section XI.B.4 of the General Permit requires samples to be representative of storm water associated with industrial activities at a facility and collected from each drainage area at all discharge locations unless an exception in section XI.C.4 of the General Permit is applicable. The requirement of representative storm water sampling includes collecting samples from the appropriate discharge locations representative of industrial activities and ensuring that the measurements taken for the purpose of monitoring be representative of those monitored activities. (General Permit Section XXI.J.1).

The Facility's SWPPP states, "There are three drainage areas exposed to industrial activities and two sample points at the site as shown on the site map(s)." The site maps depict two adjacent buildings with shared storage and operations, and the buildings are referred to "V1" and "V3." The SWPPP states, "All drainage from V1 industrial areas goes to the V1 sample point on the west side of the yard," "Some of the V3 drainage flows south to the gutter draining V1 and is commingled with that water," "The remainder of V3 drainage flows northwest to the V3 sample point," and "Both buildings have areas with drainage but no exposure to industrial activity…" The Facility's site map shows that these "non-industrial" areas share borders with the industrial areas and, in some instances, it appears that driveways used to access the "non-industrial areas" are also used to access the industrial areas. According to the SWPPP and available self-monitoring reports, storm water discharge samples are collected at the V1 sample point and V3 sample point which are located at the storm water gutters to the west of building V1 and west of building V3, respectively. The SWPPP continues to state, "Drainage from the site flows off the property to the municipal storm drain system" and "Regional drainage is to the Upper Santa Clara River (HUC 10 1807010204) Reach 6." As explained above, it appears that discharges from the Facility may be received by the Santa Clara River Reach 5 which is located closer to the Facility.

As discussed above, industrial related particulates accumulating on the Facility's roof surfaces disperse potential pollutants from indoor industrial activities that have the potential to flow to "non-industrial" drainage areas via building downspouts or otherwise track to "non-industrial" drainage areas via foot and vehicle traffic. The Facility's SWPPP does not depict the locations or flow patterns of the building's downspouts, nor does the SWPPP narratively assess the "non-industrial" drainage areas or how they're impacted by storm water flow from the roof downspouts. Consequently, the SWPPP does not adequately demonstrate that the "non-industrial" drainage areas are not potentially impacted by pollutants from the Facility's indoor industrial activities. Further, based on the SWPPP site map, vehicles appear to enter and/or exit through "non-industrial" areas to reach the V1 loading dock on the southwest side of the V1 building, the V3 truck dock on the southwest side of the V3 building, and material and waste storage areas located between the two buildings. The SWPPP states, "[A]lligatored asphalt near the V1 truck docks…could collect dust and particulates" which OCO alleges have the potential to be tracked or otherwise dispersed to the adjacent "non-industrial" areas. Further, the SWPPP



Notice of Violations and Intent to File Suit
CWI

states, "Outbound solid wastes for recycling or disposal and inbound chemicals are handled in the driveway of V1," and "Hazardous wastes [are] also shipped from [the] driveway near [the] hazardous waste area at V3" but these areas are not depicted on the SWPPP site map. The failure of the SWPPP to narratively assess these locations and depict the flow direction of the building downspouts and "non-industrial" drainage areas prohibits an accurate assessment of whether the areas claimed as "non-industrial" are exposed to pollutants from the Facility's industrial activities. Therefore, without a Facility inspection, OCO is unable to ascertain whether CWI's sample locations are representative of all industrial storm water discharging from the Facility.

OCO alleges that additional NAL exceedances would have been reported had the Facility sampled four (4) times per reporting year as required by General Permit Section XI.B(2). The Facility sampled two (2) times in 2023-2024, and one (1) time in 2024-2025. Confusingly, supporting documentation submitted with the 2024-2025 annual report shows that a sample was collected on 2/13/2025 but this sample was not reported in SMARTS in violation of the General Permit. These failures to collect and analyze the requisite amount of storm water samples occurred despite the Facility operating "6AM-1:30PM Monday-Friday" and QSEs having occurred (see **Attachment 1**). The Facility's SWPPP also states that hours of operation will vary suggesting that there are times that the Facility conducts industrial activities outside of the operating hours stated above. OCO further alleges that exceedances at the Facility have been occurring since at least February 10, 2021, during the time that the Facility was operating at this location without General Permit coverage, without a storm water pollution prevention program, without a SWPPP, and without adequate BMPs. Section 5.1 (Narrative Assessment) of the Facility's SWPPP states, "Prior City of Santa Clarita inspections noted that housekeeping should be improved and that storm water permit coverage was required." The SWPPP does not list the date(s) of the inspection(s), but the statement evidences that prior to the Facility filing its NOI on or about November 20, 2023, CWI failed to implement adequate housekeeping to prevent pollutants in its storm water discharges. Consequently, OCO further alleges that the Facility's sample results in the below table do not reflect the true volume of parameter exceedances occurring at the Facility.

The following discharges of pollutants from the Facility have violated the discharge prohibitions, receiving water limitations, and effluent limitations of the General Permit.

    a. **Discharges of Storm Water from the Facility at Concentrations in Excess of the NALs, TMDL NELs, CTR Values, and/or Basin Plan Values.**

| Date of Sample | Discharge Point | Parameter | Result | NAL Value | NEL Value | Basin Plan/ CTR Value |
|---|---|---|---|---|---|---|
| 01/20/2024* | V1 | N+N | 1.91 mg/L | 0.68 mg/L | - | - |
| 01/20/2024* | V3 | N+N | 0.96 mg/L | 0.68 mg/L | - | - |
| 02/05/2025 | V1 | Al | 2.7 mg/L | 0.75 mg/L | - | - |
| 02/05/2025 | V1 | Fe | 1.49 mg/L | 1.0 mg/L | - | - |
| 02/05/2025 | V1 | Zn | 0.615 mg/L | 0.26 mg/L | - | 0.12 mg/L |

*The self-monitoring report submitted in SMARTS lists 1/22/2024 as the date of sample collection, but the Facility's laboratory report and Chain of Custody (COC) list 1/20/2024.


OURCLEANOCEANS.ORG                         10

Notice of Violations and Intent to File Suit
CWI

### 4. Failure to Implement BAT and BCT

Based on CWI's self-reported data, the Facility's industrial storm water discharges illustrate a pattern of continuous and ongoing exceedances of water quality standards. This continuous and ongoing pattern of exceedances indicates that CWI has failed and is failing to employ measures that constitute BAT and BCT in violation of the requirements of the General Permit.

To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. (See General Permit Sections X.H.1-2). CWI has not complied with these requirements as evidenced by the Facility entering Level 1 for N+N due to the 2023-2024 reporting year exceedances and Level 1 for Al and Zn due to the 2024-2025 reporting year exceedances.  The Pollutant concentrations at V1 for the 2/5/2025 rain event were as high as 3.5 times the NAL for Al and 2 times the NAL for Zn.  Had CWI filed its NOI to comply with the General Permit when it was required to, the Facility would have been required to implement BAT/BCT sooner to prevent the above exceedances.  Therefore, CWI's failure to apply for General Permit coverage as required has contributed and continues to contribute to the degradation of water quality.

Accordingly, CWI has failed to implement the minimum BMPs required by the General Permit at the Facility, including good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. (General Permit Sections X.H.1(a–g)).  CWI has also failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including exposure minimization BMPs; storm water containment and discharge reduction BMPs; and treatment control BMPs. (General Permit Section X.H.2.)  As such, the BMPs described in the Facility's SWPPP are insufficient to prevent the exceedances for the parameters listed above.

Additionally, a device intended to filter pollutants is typically considered an advanced BMP, and the Facility's SWPPP identifies the filter socks implemented at the Facility accordingly.  To ensure the effectiveness of these types of control measures, they are required to meet the General Permit's design storm standards. (General Permit Section X.H.2.b.iii). The design standards for treatment control BMPs are listed in General Permit Section X.H.6.a-b. and are generally calculated based upon either the volume of storm water run-off produced by the 85th percentile 24-hour storm event, or the maximum flow rate of storm water run-off produced by the 85th percentile hourly rainfall intensity.  However, the Facility's Level 1 ERA Report and SWPPP both fail to explain whether the implemented filter socks are capable of treating the sufficient storm water volume or flow rate to comply with the General Permit's design standard relative to the volume of run-off from areas of the Facility they are expected to treat.  This information is critical for determining whether these filtration devices are an adequate, effective BMP.  Consequently, OCO alleges that the filter socks and media filters result in an insufficient amount of the Facility's discharge actually being filtered, allowing for bypass of unfiltered polluted discharge.



Notice of Violations and Intent to File Suit
CWI

CWI's failure to develop or implement adequate pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the General Permit every day CWI discharges without meeting BAT/BCT. Each day CWI failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the CWA (33 U.S.C. § 1311(a)). Accordingly, CWI and its Owners and/or Operators have been in violation of the BAT and BCT requirements at the Facility every day since at least February 10, 2021.

As stated above, CWI has conducted operations at the Facility since at least February 10, 2021, but failed to file its NOI to comply with the General Permit until on or about November 20, 2023. OCO alleges that, from at least February 10, 2021, to November 20, 2023, the Facility did not implement minimum BMPs or BAT/BCT, and that levels of storm water pollutants from the Facility would have been similar to or worse than the exceedances listed in the above table. As a result, OCO also alleges that CWI has discharged storm water containing excessive levels of pollutants from the Facility to the receiving water body and its watershed during every local rain event over 0.1 inches over the past five (5) years (see **Attachment 1**). Each of these rain events represents a discharge of polluted storm water run-off in violation of the CWA and General Permit. CWI is subject to civil penalties for each of these separate and distinct violations of the CWA and General Permit within the past five (5) years.

### 5. Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan

Section X of the General Permit states that dischargers shall develop and implement a site-specific SWPPP for their industrial facilities that includes: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

Further, Attachment D of the General Permit states that the Site Map shall include the following information: the facility boundary; storm water drainage areas within the facility boundary; portions of any drainage area impacted by discharges from surrounding areas and flow direction of each drainage area; on-facility surface water bodies; areas of soil erosion; location(s) of nearby water bodies (such as rivers, lakes, wetlands, etc.); location(s) of municipal storm drain inlets that may receive the facility's industrial storm water discharges and authorized Non-Storm Water Discharges (NSWDs); locations of storm water collection and conveyance systems and associated points of discharge, and direction of flow; any structural control measures (that affect industrial storm water discharges authorized NSWDs, and run-on); all impervious areas of the facility, including paved areas, buildings, covered storage areas, or other roofed structures; locations where materials are directly exposed to precipitation; locations where significant spills or leaks identified have occurred; areas of industrial activity subject to this General Permit; all storage areas and storage tanks; shipping and receiving areas; fueling areas; vehicle and equipment storage/maintenance areas; material handling and processing areas; waste treatment and disposal areas; dust or particulate generating areas; cleaning and material


OURCLEANOCEANS.ORG                                                          12

Notice of Violations and Intent to File Suit
CWI

reuse areas; and, any other areas of industrial activity which may have potential pollutant sources.

OCO has identified several deficiencies in the Facility's SWPPP including, but not limited to the following:

a. Section X.C of the General Permit requires Discharges to identify and evaluate all sources of pollutants that may affect the quality of industrial storm water discharges and authorized NSWDs.

   i. As discussed above, the Facility's SWPPP fails to adequately identify and evaluate pollutant sources from indoor manufacturing processes, glass and glass waste, paint and waste paint products, wood and wood waste, swarf buster, flocculant, sludge, and others. Further, the SWPPP fails to evaluate which pollutant parameters are affected by each industrial activity.

b. Section X.F of the General Permit requires Dischargers to ensure the SWPPP includes a list of industrial materials handled at the facility, and the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency.

   i. The Facility's SWPPP fails to provide a complete list of industrial materials at the site or to include a complete description of the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency. For example, Appendix 3 (Significant Materials List) of the SWPPP fails to list quantities of many materials and wastes stored and handled at the site including aluminum, steel, glass, mirrors, cardboard, swarf buster, swarf buster sludge, flocculant, waste glass, waste steel, aluminum shavings, waste paint filters, waste paint rags, cardboard, and wood. Many sections of the table in Appendix 3 are blank and, in a couple instances, include question marks suggesting that this information was not verified. Further, handling frequencies are not provided for any of the materials listed.

c. Section X.G.1.a of the General Permit states, "The Discharger shall ensure the SWPPP describes each industrial process including: manufacturing, cleaning, maintenance, recycling, disposal, generation of by products (including, but not limited to, air particulate emissions), and any other activities related to the process. The type, characteristics, and approximate quantity of industrial materials used in or resulting from the process shall be included. Areas protected by containment structures and the corresponding containment capacity shall be identified and described."

   i. The Facility's SWPPP generally references cutting and fabricating operations but fails to describe the specific activities related to these processes. As a result, the SWPPP also fails to specifically identify dust and particulate generating activities that are associated with cutting and fabrication. For example, Section 4.3 (Dust and Particulate Generating Activities) of the SWPPP only lists equipment storage and erodible surfaces as sources of dust and particulate generation. As discussed above, buildings at the Facility are equipped with roof fixtures, vents, and exhausts and have visible staining that indicates the accumulation of pollutants on their surfaces from indoor dust and particulate generating processes.



Notice of Violations and Intent to File Suit
CWI

Consequently, the SWPPP fails to account for the type, characteristics, and approximate quantities of particulates generated by the Facility's manufacturing processes or to specifically identify the locations where dust and particulates are generated.

ii. The SWPPP fails to include a description of how waste paint filters and waste paint rags are generated. Appendix 3 (Significant Materials List) of the SWPPP lists waste paint filters and waste paint rags as occurring outdoors at the hazardous waste storage area but there is no narrative description or assessment of painting operations, paint composition (e.g., potential metals, other potential pollutants), how these waste materials are generated, and whether paint operations produce dust and particulates.

iii. The SWPPP fails to include an adequate description of cleaning processes. For example, Section 4.1.2 (Cleaning Processes) of the SWPPP states, "No cleaning processes with potential to impact storm water occur." However, Section 4.2 (Material Handling and Storage Areas" of the SWPPP references "waste alcohol and rags from cleaning process" as materials stored and handled at the Facility's hazardous waste storage area. Appendix 3 (Significant Materials List) of the SWPPP lists these materials as "significant" and handled outdoors with exposure to storm water. Quantities and locations for the cleaning materials are provided but the SWPPP does not include a description of these cleaning processes.

iv. The SWPPP provides insufficient data about the Facility's wastewater treatment plant and waste disposal processes including how empty drums, empty bags, and waste cleaning products are handled and disposed of.

v. Further, the SWPPP fails to describe the specific types of maintenance performed onsite as well as the related information required by Section X.G.1.a of the General Permit.

d. Section X.G.1.b of the General Permit states, "The Discharger shall ensure the SWPPP describes each material handling and storage area, including: the type, characteristics, and quantity of industrial materials handled or stored; the shipping, receiving, and loading procedures; the spill or leak prevention and response procedures; and the areas protected by containment structures and the corresponding containment capacity."

i. As stated above, the SWPPP fails to identify the type, characteristics, and quantity of many materials and wastes handled in and generated from its industrial processes and activities.

e. Section X.G.1.c of the General Permit states, "The Discharger shall ensure the SWPPP describes all industrial activities that generate a significant amount of dust or particulate that may be deposited within the facility boundaries. The SWPPP shall describe such industrial activities, including the discharge locations, the source type, and the characteristics of the dust or particulate pollutant."

i. As explained above, the SWPPP fails to describe the industrial activities that generate a significant amount of dust or particulate and thereby fails to describe the source type and characteristics of the dust or particulate pollutants at the Facility.



OURCLEANOCEANS.ORG

14

Notice of Violations and Intent to File Suit
CWI

   f.   A SWPPP shall identify and evaluate pollutants that may affect the quality of industrial
storm water discharges and authorized non-storm water discharges. (General Permit
Section X.C.1.a.).  Additionally, Section X.G.2.a of the General Permit requires a
SWPPP to include a narrative assessment of all areas of industrial activity with potential
industrial pollutant sources.  At a minimum, the assessment shall include: the areas of the
facility with likely sources of pollutants in industrial storm water discharges and
authorized NSWDs; the pollutants likely to be present in industrial storm water
discharges and authorized NSWDs; the approximate quantity, physical characteristics
(e.g., liquid, powder, solid, etc.), and locations of each industrial material handled,
produced, stored, recycled, or disposed; the effectiveness of existing BMPs to reduce or
prevent pollutants in industrial storm water discharges and authorized NSWDs; the
estimated effectiveness of implementing, to the extent feasible, minimum BMPs to
reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs;
and, the identification of the industrial pollutants related to the receiving waters with
303(d) listed impairments identified in Appendix 3 or approved TMDLs that may be
causing or contributing to an exceedance of a water quality standard in the receiving
waters.

      i.   The Facility's SWPPP does not include an adequate narrative assessment of many
of the Facility's industrial activities such as manufacturing, cleaning, and
maintenance.  Consequently, the SWPPP does not adequately address or describe
all potential pollutants associated with these processes such as Zn from
vehicle/equipment, Cu from glass and waste glass, COD from wood and wood
waste, and various metals potentially present in paint and waste paint products.
As discussed, these activities are either conducted outdoors without adequate
cover or BMPs or conducted indoors with potential for dispersion and track out.

      ii.   Section 5.1 (Narrative Assessment) of the SWPPP states, "The primary pollutants
of concern from the observed activities are particulates and iron" and "Oil
residues from equipment exposed to rain may exist but would be less significant."
Other sections of the SWPPP identify "particulates" as being characteristic of
materials handled at the different industrial activity areas but do not effectively
evaluate how these pollutants may affect storm water discharge quality or the
parameters they contribute to.

      iii.   The SWPPP fails to identify the list of impaired pollutants applicable to the
Facility's Receiving Water.  Section 5.1 (Narrative Assessment) of the SWPPP
identifies that the Receiving Water is 303(d)-listed but does not evaluate the listed
impairments.

      iv.   The SWPPP fails to identify the list of impaired pollutants applicable to the
Facility's HUC-10 Watershed.  Section 5.1 (Narrative Assessment) of the SWPPP
identifies the HUC-10 Watershed but does not evaluate the listed impairments.

      v.   Accordingly, the Facility's SWPPP fails to identify and evaluate all pollutants
that are likely to be present in and that may affect the quality of the Facility's
industrial storm water discharges and authorized non-storm water discharges,
especially those that may be causing or contributing to an exceedance of a water
quality standard in the receiving waters.

      vi.   The Facility also fails to adequately assess the effectiveness of existing BMPs to
reduce or prevent pollutants in industrial storm water discharges and authorized
NSWDs as well as the estimated effectiveness of implementing, to the extent



OURCLEANOCEANS.ORG

15

feasible, minimum BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs because the Facility cannot sufficiently make this assessment without properly identifying and assessing all applicable 303(d) and HUC-10 pollutants.

g.  Section X.G.2.b requires Dischargers to identify in the SWPPP any areas of the facility where the minimum BMPs described in subsection H.1 will not adequately reduce or prevent pollutants in storm water discharges in compliance with Section V.A. Dischargers shall identify any advanced BMPs, as described in subsection H.2, for those areas. (General Permit Section X.G.2.b).

   i.  The Facility's SWPPP fails to include the required actions stated in its Level 1 ERA Report dated 10/8/2024.  The Level 1 report states, "This year, the site will take pictures of each location where the [EnviroSoxx] socks will be installed and show how they are to be set up. Photos will be placed in Appendix 10 of the SWPPP."  As of the date of this letter, the SWPPP has not been updated in accordance with the Level 1 report.

h.  Section X.E of the General Permit requires Dischargers to prepare a site map that identifies all industrial storage areas and storage tanks, shipping and receiving areas, fueling areas, vehicle and equipment storage/maintenance areas, material handling and processing areas, waste treatment and disposal areas, dust or particulate generating areas, cleaning and material reuse areas, and other areas of industrial activity that may have potential pollutant sources.  Additionally, the Discharger shall include storm water drainage areas within the facility boundary.  The Facility's site map has several deficiencies including, but not limited to:

   i.  Failure to identify the building's roof downspouts and flow directions.
   ii.  Failure to identify storm water flow and discharge locations associated with "non-industrial" drainage areas.
   iii.  Failure to identify industrial processes/activities performed in each building that have the potential for exposure of pollutants to storm water (i.e., via venting or track out).
   iv.  Failure to identify the dust and particulate generating areas.
   v.  Failure to identify the shipping and receiving areas at the V1 and V3 driveway areas.
   vi.  Failure to identify cleaning area(s).
   vii.  Failure to identify the equipment and maintenance area(s).

Section X.B. of the General Permit also requires CWI to revise its SWPPP whenever necessary and certify and submit its SWPPP to SMARTS within 30 days of any facility changes that require significant SWPPP revisions(s), and to certify and submit via SMARTS any non-significant revisions not more than once every three (3) months in the reporting year.  (General Permit Section X.B).  Accordingly, facilities with discharges in violation of the General Permit's Receiving Water Limitations and/or water quality standards must implement additional BMPs or other control measures to achieve compliance with applicable receiving water limitations.  The SWPPP must be updated with the additional BMPs that will be implemented to achieve water quality standards, along with an implementation schedule.  (General Permit Section I.E).  The Facility's SWPPP updates do not include adequate BMPs to achieve applicable water quality



Notice of Violations and Intent to File Suit
CWI

standards as demonstrated by the continuing exceedances. As such, the Facility has failed to develop and update its SWPPP as required and is in daily violation of the General Permit and CWA.

Every day CWI fails to develop and implement an adequate SWPPP is a violation of the General Permit. CWI has been in violation of the General Permit Section X requirements at the Facility every day since at least February 10, 2021, when the Facility filed its NOI to comply with the General Permit.

### 6. Failure to Develop and Implement an Adequate Monitoring and Reporting Program and to Perform Annual Comprehensive Site Compliance Evaluations

The General Permit requires Facility operators to develop and implement a Monitoring Implementation Program ("MIP"). (General Permit Section X.I). The MIP is required to ensure that the Facility adequately detects and measures its storm water discharges to ensure compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Industrial General Permit. (General Permit Fact Sheet Section II.J(1)). Facility operators must ensure that their MIP practices reduce or prevent pollutants in storm water and authorized non-storm water discharges as well as evaluate and revise their practices to meet changing conditions at the Facility. (General Permit Section I.K(70)). This may include revising the SWPPP as required by General Permit Section I.K(69).

In order to adequately detect and measure its storm water discharges to ensure compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Industrial General Permit, CWI is required to visually observe and collect samples of storm water from all locations where storm water is discharged unless an exception applies. (General Permit Section XI.A). This includes collecting at least two (2) samples from each discharge location at the Facility during the first half of the reporting year, and at least two (2) samples from each discharge location during the second half of the reporting year. (General Permit Section XI.B). As explained above, samples are required to be analyzed for SIC code required parameters, additional pollutants present in industrial activities that are potentially exposed to storm water, applicable 303(d) parameters, applicable HUC-10 parameters, and applicable TMDL parameters. As also explained above, the Facility has failed to sufficiently identify and assess the applicable pollutant source parameters, 303(d) parameters, and HUC-10 parameters, and has failed to properly evaluate and identify all discharge locations potentially exposed to industrial activities at the Facility. The Facility has also failed to collect the required number of QSEs for the two reporting years since filing its Notice of Intent to comply with the General Permit.

CWI has been operating the Facility with an inadequately developed and/or inadequately implemented MIP, in violation of the substantive and procedural requirements set forth in Section B of the Industrial General Permit. CWI's monitoring has not resulted in practices at the Facility that adequately reduce or prevent pollutants in storm water or to properly evaluate all discharge points and pollutants associated with industrial activities as required by Section X.I of the General Permit. This is evidenced by the exceedances occurring at the Facility since the 2023-2024 reporting year and SWPPP deficiencies explained above. Therefore, CWI has been



OURCLEANOCEANS.ORG

17

Notice of Violations and Intent to File Suit
CWI

in daily and continuous violation of the General Permit's MIP requirements every day since at least February 10, 2021. Every day that CWI operates with an inadequate MIP is a separate and distinct violation of the General Permit and the CWA. As such, CWI is subject to civil penalties for all associated violations of the CWA since at least February 10, 2021.

Section XV of the General Permit requires Dischargers to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling data. This Annual Evaluation must include an assessment of all BMPs for each area of industrial activity and associated potential pollutant sources to determine if the BMPs are properly designed, implemented, and effective in reducing and preventing pollutants in industrial storm water discharges and authorized NSWDs. The Facility's sampling data in the above table indicates the Facility has continuously failed to comply with this requirement. This failure to comply negates a key component of the evaluation process required in self-monitoring programs such as the General Permit, and in CWI's case, has resulted in continued NAL exceedances. Further, the Facility's 2024-2025 Annual Report states, "There has been no evaluation done in the reporting year of 7-1-24 through 6-30-2025." CWI is in ongoing violation of the General Permit and CWA every day that the Facility operates without evaluating the effectiveness of BMPs and the need for additional BMPs. Each of these violations is a separate and distinct violation of the General Permit and the CWA. CWI is subject to civil penalties for all violations of the CWA occurring over the past 5 years.

### 7. Failure to Comply with the General Permit's Reporting Requirements

A Discharger shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS. (General Permit Section XVI). The Annual Report requires a Discharger to answer pre-populated compliance assessment questions and explain any instances of non-compliance. A Dischargers responses are certified under penalty of perjury by a Legally Responsible Person (LRP) for the reporting facility (i.e. Discharger).

The deficiencies and violations detailed within this notice indicate the Facility has failed to accurately report its non-compliance with the General Permit in the Facility's Annual Reports. Additionally, the Annual Reports submitted by the Facility include numerous misrepresentations. For example, every Annual Report submitted during the five-year period applicable to this notice falsely certifies that the Facility has included the applicable HUC-10 pollutants in the SWPPP pollutant source assessment and assessed the need for analytical monitoring for the pollutants. However, the Facility's SWPPP failed and continues to fail to include the pollutants and/or an assessment during those reporting periods. The Facility's 2023-2024 Annual Report also falsely certifies that the Facility sampled the required number of QSEs during the reporting year for all discharge locations although the Facility failed to sample the required number of four (4) QSEs for this reporting period. Further, the Facility's 2024-2025 Annual Report states that there was no Annual Evaluation done during the 2024-2025 reporting year. Therefore, CWI is in continuous violation of the General Permit.

Section XI.B.11.a of the General Permit requires dischargers to submit all sampling and analytical results via SMARTS within 30 days of obtaining all results for each sampling event



Notice of Violations and Intent to File Suit
CWI

from the laboratory.  According to supporting documentation submitted by the Facility with its
2024-2025 Annual Report, a sample was collected on 2/13/2025 but there is no record of the
Facility's submitting its self-monitoring report for this sample.

   Each day the Facility operates with inadequate reporting is a separate and distinct violation
of the General Permit and CWA.  These violations are ongoing and continuous and CWI is
subject to civil penalties for all violations of the CWA occurring over the past 5 years.

## III. PERSON RESPONSIBLE FOR THE VIOLATIONS

CWI, and its Owners and/or Operators are responsible for the violations at the Facility described in
this notice letter.

## IV. NAME AND ADDRESS OF NOTICING PARTY

Our Clean Oceans, Inc.
8549 Wilshire Blvd. #2121
Beverly Hills, CA 90211
Phone: 833-241-8799
info@ourcleanoceans.org

## V. LEGAL COUNSEL

Mares Legal, P.C.
Tim Mares, Esq.
240 W Chapman Ave., Suite 200
Orange, CA 92866
(310) 940-7433
tim@mareslegalpc.com

## VI. Conclusion

OCO is willing to discuss effective remedies for the violations described in this notice letter before
the end of the 60-day notice period.  If OCO's legal counsel is promptly notified, it may be possible
to avoid litigation.  However, as previously stated, if no resolution is reached by the close of the 60-
day notice period, OCO intends to file suit under CWA section 505(a) against CWI for the above
referenced violations.  If CWI or its representatives wish to engage in settlement discussions, please
contact OCO's legal counsel listed above.

Sincerely,

*Tim Mares*

Tim Mares, Esq.



OURCLEANOCEANS.ORG                                                                19

Notice of Violations and Intent to File Suit
CWI

## SERVICE LIST

**Via U.S. Mail**

Pam Bondi
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Lee Zeldin
Administrator
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460 (1101A)

Eric Oppenheimer
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, California 95812-0100

Josh F.W. Cook
Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Susana Arredondo
Executive Officer
Los Angeles Regional Water Quality Control Board
320 W. 4th Street, #200
Los Angeles, California 90013


OURCLEANOCEANS.ORG

20

Notice of Violations and Intent to File Suit
CWI

**ATTACHMENT 1**
Santa Clarita 3.1 WSW, CA US (USW00003122)
Days with Precipitation over 0.1 inches

| | | | | |
|---|---|---|---|---|
| 12/28/2020 | 4/22/2022 | 1/16/2023 | 12/22/2023 | 2/13/2025 |
| 12/29/2020 | 9/10/2022 | 1/30/2023 | 12/30/2023 | 2/14/2025 |
| 1/24/2021 | 10/13/2022 | 2/24/2023 | 1/3/2024 | 3/6/2025 |
| 1/25/2021 | 11/2/2022 | 2/25/2023 | 1/21/2024 | 3/12/2025 |
| 1/29/2021 | 11/8/2022 | 2/26/2023 | 2/1/2024 | 3/13/2025 |
| 1/30/2021 | 11/9/2022 | 2/28/2023 | 2/2/2024 | 6/4/2025 |
| 3/10/2021 | 12/2/2022 | 3/1/2023 | 2/5/2024 | |
| 3/12/2021 | 12/3/2022 | 3/10/2023 | 2/6/2024 | |
| 3/16/2021 | 12/5/2022 | 3/15/2023 | 2/7/2024 | |
| 10/26/2021 | 12/11/2022 | 3/21/2023 | 2/8/2024 | |
| 12/14/2021 | 12/12/2022 | 3/22/2023 | 3/2/2024 | |
| 12/15/2021 | 12/28/2022 | 3/23/2023 | 3/7/2024 | |
| 12/23/2021 | 1/1/2023 | 3/29/2023 | 3/24/2024 | |
| 12/24/2021 | 1/3/2023 | 3/30/2023 | 3/30/2024 | |
| 12/25/2021 | 1/4/2023 | 3/31/2023 | 3/31/2024 | |
| 12/26/2021 | 1/5/2023 | 5/4/2023 | 4/1/2024 | |
| 12/30/2021 | 1/6/2023 | 8/21/2023 | 4/6/2024 | |
| 12/31/2021 | 1/9/2023 | 11/18/2023 | 1/26/2025 | |
| 1/18/2022 | 1/10/2023 | 12/20/2023 | 1/27/2025 | |
| 3/29/2022 | 1/15/2023 | 12/21/2023 | 2/7/2025 | |

